## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIDALIA ADORNO<br>*Plaintiff,*<br><br>v.<br><br>NANCY A. BERRYHILL,[1] Acting<br>Commissioner of Social Security<br><br>*Defendant.* | CIVIL ACTION<br>NO. 15-4269 |

**PAPPERT, J.**                                                    **December 29, 2017**

### MEMORANDUM

Plaintiff Eridalia Adorno, pursuant to 42 U.S.C. § 1383(c)(3)[2], seeks judicial review of a decision by the Commissioner of Social Security denying her claim for Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* The Administrative Law Judge's decision was upheld by the Appeals Council and Magistrate Judge Perkin subsequently recommended that Adorno's request for review be denied.[3] Adorno filed objections to Judge Perkin's Report and Recommendation ("R&R") and now argues that the Commissioner's decision should be overturned because: (1) the ALJ erred in finding that the hypothetical question to the vocational expert sufficiently accounted for Adorno's treating psychiatrist's opinion that she had moderate limitations in understanding,

---

[1]    Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill should be substituted for the former Acting Commissioner, Carolyn Colvin, as the defendant in this action. *See* FED. R. CIV. P. 25(d).

[2]    42 U.S.C. § 1383(c)(3) incorporates by reference 42 U.S.C. § 405(g).

[3]    A district court judge may refer an appeal of a decision of the commissioner to a magistrate judge for a R&R. *See* 28 U.S.C. § 636(b)(1).

remembering and carrying out simple job instructions; and (2) her relative mental stability in the absence of full-time employment cannot constitute substantial evidence to support the ALJ's determination that she is not disabled.  For the reasons below, the Court overrules Adorno's objections to the R&R and grants judgment in favor of the Commissioner.

# I

## A

Adorno was born on January 30, 1975 (R. 279.)[4]  In February 2012, when she was thirty-seven years old, she filed applications for both SSI and Disability Insurance Benefits ("DIB"), alleging disability due to bipolar depression, depression and anxiety. (R. 123, 279–289.)  Adorno initially sought DIB for a disabling condition that commenced "on November 1, 2005," (R. 279) and SSI for a disability that "began on April 20, 2009."  (R. 281.)  Citing "insufficient evidence," the Social Security Administration denied her applications for SSI and DIB on April 5, 2012.  (R. 140–47.) Adorno filed a timely request for a hearing before an ALJ.  (R. 148.)  A July 10, 2013 hearing (where plaintiff was unrepresented) was continued so that medical evidence could be obtained. (R. 98.)  Plaintiff then appeared, with counsel, and testified at a second hearing before ALJ William A. Kurlander on October 2, 2013.  (R. 37.)  At the second hearing, Adorno modified her alleged onset of disability date to February 1, 2011 and voluntarily withdrew her claim for DIB.  (R. 42–47.)  An impartial vocational expert, Nancy Harter, appeared and testified.  (R. 82–91.)  Before the ALJ rendered his

---

[4]    The record, consisting of 1250 numbered pages, was uploaded to ECF in piecemeal fashion. *See* ECF Nos. 6-1–6-16.  The Court will cite to the record page numbers rather than the specific ECF document identifiers.

decision, a third hearing was held on June 17, 2014.[5]

On July 25, 2014, the ALJ found that Adorno was "not disabled under section 1614(a)(3)(A) of the Social Security Act." (R. 31.)  Relying on the record evidence, he wrote that Adorno had "worked after the amended alleged disability onset date but this work activity did not rise to the level of substantial gainful activity . . . ." (R. 22.) Consistent with 20 C.F.R. § 416.920(c), Adorno had "the following severe impairments: major depressive disorder, bipolar disorder, mood disorder, and generalized anxiety disorder" and that these "impairments cause[d]  significant limitations in [her] ability to perform basic work activities during the period being adjudicated . . . ."[6]  (*Id.*)

The ALJ concluded that Adorno did not have an impairment or combination of impairments that met or medically equaled "the criteria of listing 12.04 (Affective disorders) or listing 12.06 (Anxiety related disorders)."  (*Id.*)  He found that Adorno did not satisfy these criteria because her "mental impairments [did] not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  (R. 24.).  He reported that Adorno exhibited "moderate restriction" in activities of daily living, "moderate difficulties" both in social functioning and "[w]ith regard to concentration, persistence or pace . . . ."  (R. 23–24.)  Also, during the relevant time period, Adorno "experienced no episodes of decompensation[ ] which have been of 'extended duration.'"  (R. 24.)  He found there was no evidence "that minimal increases in mental demands or a change in the

---

[5]    Another vocational expert was present at the June 17, 2014 hearing, but she did not testify. (R. 121.)
[6]    The ALJ also considered record evidence that Adorno had "elbow arthralgia, shin pain, asthma, anemia, obesity" and a "history of substance abuse," but concluded that these conditions did not "impose any significant restrictions on her ability to perform basic work activities" and therefore were "not 'severe' impairments as defined in the regulations."  (R. 23.)

environment would cause her to decompensate or that she has the inability to function outside a highly supportive living environment" and there was "no indication that [she] ha[d] the complete inability to function outside the area of her home." (*Id.*)

In reaching his decision, the ALJ cited Adorno's testimony that "she had not driven in two years, but was able to use public transportation," that "she attends church with no reported difficulty, visits her boyfriend on the weekends, shops for groceries with her daughter, and has her nails and eyebrows done in a salon," and that "she read the Bible and has acted as the representative payee for her son's disability benefits." (R. 23–24.) The ALJ also cited Adorno's testimony that she "does not spend time with her granddaughter or help take care of her" and "has anxiety moods and prefers to be alone." (R. 23.) He noted treatment records reflecting "that [Adorno] is irritable with episodes of rage and homicidal ideation," and documenting "occasional reports of lack of concentration or focus, and some complaints of memory problems." (R. 24.) He wrote that Adorno "had several hospitalizations for depression and suicidal gestures" but noted "these episodes have not lasted for at least two weeks . . . ." (*Id.*) He explained she "seemed depressed . . . and had a 'flat affect'" at her hearing, but found she "overestimates her functional limitations . . . ." (R. 27.)

Considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," the ALJ determined Adorno had

> the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled, reasoning level 1-2 work; no more than occasional interaction with coworkers and supervisors, but no interaction with the general public; and no more than occasional work at exposed heights.

(R. 24.) He explained that "a limitation to unskilled work, requiring only reasoning level 1 or 2, with occasional interaction with co-workers and supervisors and no contact with the general public [was] warranted," in light of her mental health treatment records documenting "her ongoing symptoms of bipolar disorder, depression, and anxiety despite medication and therapy . . . ." (R. 27.) The treatment records "support[ed] her 'moderate' limitations in social functioning and maintaining concentration, persistence or pace." (*Id.*) However, the record did "not support a finding that [Adorno] is unable to perform the mental demands of unskilled work with social limitations." (*Id.*) The ALJ noted that "[e]ven when [plaintiff] was hospitalized for depression and suicide attempts, her mental status typically remained intact" and wrote that "[a]fter June 2012, there is no further inpatient treatment evidenced in the record." (*Id.*) Rather, Adorno had continued with "consistent outpatient treatment with regular medication checks with psychiatrists and supportive therapy" and had "become more stable . . . ." (*Id.*)

On June 17, 2015, the Appeals Council denied Adorno's request for review. (R. 1–9.) Her complaint was filed in this action on August 14, 2015, after she was granted leave to proceed *in forma pauperis*. (Compl., ECF No. 3.) She filed a brief and statement of issues in support of her request for review on October 30, 2015 and the Commissioner filed a response on December 2, 2015. (Pl.'s Br., ECF No. 9, Def.'s Resp., ECF No. 10.) Magistrate Judge Perkin issued his R&R recommending denial of Adorno's request for review on May 30, 2017. (R&R, ECF No. 15.) He found "substantial evidence supports the ALJ's finding of non-disability" and Adorno "failed to prove that she has an impairment(s) which prevents her from performing substantial

gainful activity." (*Id.* at 22.) Adorno filed objections on June 6, 2017. (Pl's. Objs., ECF No. 17.) The Commissioner filed a response on June 20, 2017. (Def.'s Resp. to Pl.'s Objs., ECF No. 19.)

**B**

The Court has reviewed the decision of the ALJ along with the entire administrative record and summarizes here the evidence relevant to Adorno's request for review of the ALJ's finding of non-disability.

**i**

First, Adorno's testimony regarding her employment and her daily life were considered by the ALJ and are relevant to his finding.

**a**

With respect to her employment history, Adorno testified she graduated from high school in 1995. She started an associate's degree program at the Community College of Philadelphia sometime around 2003, but did not finish. (R. 52.) In 2009, Adorno worked for Hersha Hospitality Management for around five months. (R. 53–54.) She was responsible initially for filling a breakfast bar. (R. 53.) She testified that after having "problems with one of the other coworkers" she "started working at the housekeeping area" but that she "wasn't performing the job well" and "was having trouble with the supervisor too." (R. 57.) Adorno testified that she quit the hospitality job because she "was working and crying all day." (*Id.*) Her only testimony regarding subsequent employment was that she spent around two days working in a fruit factory in 2013. (R. 53, R. 113.) She explained she stopped working at the fruit factory because she "had to work under pressure" and "had to be fast" and she "couldn't handle it" and

6

"couldn't take the pressure." (R. 57–58.)

The ALJ asked Adorno if she thought she could work a full time job. (R. 117.) She testified that she felt she could not, explaining "I can't take the pressure of being in a place where a supervisor is on top of me watching me. I can't get up sometimes in the morning. I can't sleep at night even with the medication. Sometimes I have bad nights, good days. I'm constantly changing." (R. 117.) She explained that with "work, I have to get up every morning and be there on time, and I know sometimes I'm not going [to] even be able to get up from bed." (R. 118.) Asked if she had problems being around people or whether she had more of an issue with a lack of energy, Adorno testified, "[i]t's lack of energy. Sometimes I just want to be alone too." (R. 117.)

**b**

The ALJ considered Adorno's testimony that she suffers from depression, explaining that in an average month, she has "more bad days" than good days. (R. 70.) Adorno explained that "[i]f I'm feeling very depressed, then I don't want to see nobody. I don't go nowhere." (R. 69.) She testified that on bad days, she would be "sleeping all day." (R. 70.) She also testified that she went to church once a week in a church van and, with transportation assistance from two friends, would visit with a boyfriend on weekends. (R. 61–63.) She explained she did not get to see her boyfriend "much unless I go to his job" where she had visited him "one or two times." (R. 67–68.) Asked what determines whether she goes to see her boyfriend or not, Adorno said "[m]y mood." (R. 69.) Adorno testified that she had last driven a car sometime in 2011 and "rarely" took the bus to go places. (R. 55–56.) Instead, a friend would take her to a salon to have her nails or eyebrows done "once a month." (R. 64–67). She testified that when at home,

she sometimes microwaved frozen dinners and watched telenovelas, although not following the plotline for an entire episode. (R. 65–66.) She testified that she did not do much reading because she "can't focus." (R. 67.)

In December 2012, Adorno traveled on her own to Puerto Rico to visit family for a month or two "because of depression and all that stuff that I was going through." (R. 58.) Asked why she was hospitalized a number of times in 2012 before going to Puerto Rico, Adorno testified that her youngest "daughter was raped by a boyfriend that [plaintiff] had." (R. 74.) While in Puerto Rico, Adorno stayed at her sister's house, leaving only to go to her mother's house." (R. 59–61.) She testified that she "wasn't there to have a good time." (R. 61.)

At the time of her October 2, 2013 testimony, Adorno lived with her eighteen-year-old daughter – a student – and her granddaughter, but she did not take care of her granddaughter. (R. 49–51.) In addition to her eighteen-year-old daughter, Adorno testified that she had children who were eleven, sixteen and twenty. (R. 72.). She testified that she had voluntarily relinquished custody of her minor children to their father because she could not take care of them. (R. 72.) She explained that she "couldn't get up in the morning to . . . get my daughter prepared to go to school. She . . . was going to school late. I couldn't provide a home for them. I just couldn't take the pressure of handling somebody else." (*Id.*) Despite this testimony, in June 2014 Adorno testified to the ALJ that she had been the representative payee for her twenty-year-old son's SSI benefits for attention deficit hyperactivity disorder until his benefits had stopped in or around 2012. (R. 111–112.)

Second, in conjunction with Adorno's testimony, the ALJ considered her medical records. He explained that "[t]he medical evidence reveals claimant's long history of mental health treatment for depression and anxiety." (R. 25.) The record shows Adorno was treated and seen by psychiatrists at the Pan American Behavioral Health Clinic (PABH) from November 2007 through November 2013. (R. 929.) *See also* (R. 361–410, 930–1250.)

In June 2010, Dr. Roger Erro of PABH reported Adorno "continued to fare well" and had not experienced "any recent or significant mood swings." On an interim report form, he marked boxes to report Adorno was stable, calm, cooperative, had an appropriate affect, euthymic mood and lucid thought process with neutral thought content. (R. 1032–33.) In July, 2010, he reported similar findings, noting "Adorno has continued to fare well in the interim and further inquiry failed to reveal any significant concerns or worries." (R. 1034.) Dr. Erro completed another interim report on February 11, 2011, just after Adorno's revised February 1, 2011 "onset of disability date." (R. 976–977.) He marked boxes reflecting that Adorno was friendly, calm and cooperative, with an appropriate affect, euthymic mood and lucid thought processes. (R. 977.) Adorno had "worries," but was stable and "continued to fare well with her prescribed psychiatric medications." (R. 976–977.)

Then, on March 24, 2011, Adorno was hospitalized at Temple University Hospital for "complaints of severe depression with suicide[e] attempt . . . by taking overdose of all her psychiatric medications . . . ." (R. 489.) She was admitted at Temple after a session with her therapist at PABH "where she reported her suicide[e]

attempt . . . ." (*Id.*) Adorno was discharged on March 30, 2011 "in improved stable condition" with a prognosis which "can be good with adequate continuous psychiatric treatment, but because of the existence of the comorbidity [(use of marijuana)] and the past history of treatment noncompliance[,] overall prognosis appeared to be guarded." (R. 490.)

By May 2011, Dr. Erro reported Adorno "stated that she is doing well on all of her prescribed psychiatric medications and further inquiry revealed that she is using them all as prescribed." (R. 1040.) No additional interventions were recommended. (*Id.*) In June 2011, Dr. Erro reported she was continuing "to use her medications with positive effects" and noted she "failed to reveal new concerns or onset of depressive symptoms." (R. 1042.)

In spite of her status in May and June of 2011, as the ALJ noted in his decision (R. 25), Adorno was again admitted to the hospital for psychiatric care from July 13 to July 19, 2011, having reported she "was depressed and took a lot of pills." (R. 481.) Her discharge summary noted she "report[ed] low energy for the past month, feeling depressed, getting into crying spells and having okay sleep." (*Id.*) On discharge, after therapy and starting medication with Celexa and Klonopin, Adorno exhibited a euthymic mood and an affect within normal range. (R. 482.)

In October and November 2011, Dr. Stanford Bazilian,[7] who appears to have taken over from Dr. Erro as Adorno's treating psychiatrist at PABH, completed interim reports in which he noted she was calm, friendly and cooperative, with an appropriate affect, euthymic mood, lucid thought processes, with neutral thought content and no

[7]     The R&R inaccurately refers to Dr. Bazilian as Dr. Brazilian. *See, e.g.,* (ECF No. 15 at 8.)

perceptual disturbances.  (R. 1036–41.)  Adorno was assessed as "stable" Dr. Bazilian reported she was doing well on her prescribed medications.  (*Id.*)

Adorno saw Dr. Bazilian on January 17 , 2012 and he again reported similar findings, noting Adorno was "anxious" but "there have not been any recent or significant mood swings since her last appointment and daily activities have not diminished." [8] (R. 1057.)  When he saw her on March 7, 2012, Dr. Bazilian noted Adorno was anxious and frustrated, but also wrote that her "mood has not diminished and she characterized herself today in even terms.  There have not been any significant mood swings and she has not warranted an increase in her medications for her free floating anxiety."  (R. 1055.)

Nevertheless, just a week later, on March 15, 2012 Adorno was involuntarily admitted to Albert Einstein Hospital after she reported she had ingested "a handful of pills in an attempt to kill herself."  She remained hospitalized through March 20.  (R. 757.)  Medical records from the admission note that "while on our unit [she] was confronted with the news that one of her daughter[s] maybe was sexually abused by [Adorno's] ex-boyfriend."  (R. 758.)  Adorno was treated with therapy and medication, including Citalopram, Klonopin and Lamictal.  (*Id.*)  She was discharged after "[s]he started expressing good plans for the future," "had no suicidal ideation anymore, [and] expressed desire to get better for her daughters."  (*Id.*)  At discharge she was diagnosed

---

[8]     Adorno filed her application for SSI in February 2012, after this visit.  (R. 281.)  For purposes of SSI, a claimant is only entitled to benefits starting "the month following the month [the claimant] filed the application." 20 C.F.R. § 416.335; *see also id.* § 416.200  ("the first month for which you may receive SSI benefits is the month after the month in which you meet these eligibility requirements"); *id.* § 416.501 ("Payment of SSI benefits will be made for the month after the month of initial eligibility and for each subsequent month provided all requirements for eligibility . . . and payment . . . are met.").

with "[b]ipolar affective disorder, currently depressed, moderate" and her prognosis was reported to be "[f]air as long as compliant with medication and aftercare." (*Id.*)

As the ALJ explained in his decision (R. 26), Adorno was hospitalized again from April 3, 2012 to April 13, 2012. (R. 608–09.) She was admitted to Friends Hospital "with complaint of positive homicidal ideation towards her ex-boyfriend, who raped her 9-year old daughter." (R. 608.) Her discharge summary noted that "later[,] the patient changed her story and said that there was no abuse; it was made up by her 9-year old daughter." *(Id.)* When she was discharged, Adorno's mental status examination noted she was "disheveled," "made poor eye contact, "was negativistic and passive," and had "hopeless" thought content, but she did not exhibit suicidal ideation. (*Id.*)

Shortly thereafter, from April 17, 2012 to April 27, 2012, Adorno participated in a "partial hospitalization program" at Fairmount Behavioral Health System for mood issues and homicidal ideation towards her ex-boyfriend. (R. 425–436.) On her initial psychiatric evaluation, she described her mood as "alright," although she demonstrated an "irritable" affect. (R. 433.) It was reported that Adorno was "noncompliant" with respect to her lithium prescription "due to side effects" and as a result it was recommended that she discontinue the medication (R. 431, R. 436.)

On May 30, 2012, Dr. Bazilian completed an interim report in which he noted Adorno "presented with no new concerns or worries" and she "state[d] that she is doing well with all of her prescribed medications . . . ." (R. 1053.) He checked the box noting plaintiff was "anxious," but also checked boxes indicating she was well groomed, friendly, cooperative and had an appropriate affect. (*Id.*)

As the ALJ wrote, plaintiff "returned to the hospital in June 2012 with a plan to

take an overdose of her medication." (R. 26.) According to the record, the hospitalization was prompted by plaintiff's "fiancé of 4 months" having ended their "relationship because of her psychiatric symptoms." (R. 417.) Her final "Axis I" diagnosis at discharge was "bipolar disorder, depressed, recurrent, severe but improved." (R. 416.) It was anticipated that she might regress "since the breakup was recent . . . ." (R. 418.)

On October 17, 2012, Dr. Bazilian reported Adorno "has continued to fare well and inquiry failed to reveal any significant concerns or worries." (R. 1051.) He checked boxes to report she was friendly, calm and cooperative, with an appropriate affect and a euthymic mood and lucid thought processes. (*Id.*) Adorno was maintained on the same medications after her visit. (R. 1052.)

On May 15, 2013, Dr. Bazilian reported that since Adorno had last been seen "she had no new concerns or worries. Her free floating anxiety is managed with anti-anxiety medications. Further inquiry found she is using all of her medications correctly and there [was] no evidence of misuse." (R. 943.) As Adorno continued her treatment at PABH, psychiatrist Dr. John Koleth reported similar findings. On July 13, 2013, he wrote that she "feels current meds are helping." (R. 931.) On August 8, 2013, he wrote that she "spoke of still having mood swings" but denied having suicidal or homicidal ideation. (R. 938.) On September 7, 2013, Dr. Koleth assessed her as "stable," noting she reported "she is doing well at this time except for problems with memory." (R. 940.) In an October 2, 2013 visit, Adorno was again assessed as "stable," although she reported problematic thoughts regarding her daughter and ex-boyfriend. (R. 1100.)

On November 5, 2013, Dr. Bazilian and Adorno's treating psychotherapist

Jezebel Ortiz completed a medical assessment[9] of her ability to do work-related activities on a day-to-day basis in a regular work setting.[10]  (R. 926.)  Dr. Bazilian and Ms. Ortiz completed the form assessment, which instructed them to assess how Adorno's "mental/emotional capabilities are affected by [her] impairment(s)."  (*Id.*)  Reviewing Adorno's ability to make "occupational adjustments," Dr. Bazilian and Ms. Ortiz concluded she demonstrated "extreme" limitations in her ability to deal with the public, to interact with a supervisor, to deal with work stresses and to maintain attention/concentration."  (R. 927.)  They also found Adorno demonstrated "marked" limitations with respect to her ability to follow work rules, relate to co-workers, use judgment and function independently.  (*Id.*)  Considering her "ability to adjust to a job," a box on the assessment form was checked to reflect that Adorno exhibited "marked" limitations with respect to her ability to understand, remember and carry out both "complex" and "detailed, but not complex," job instructions.  (*Id.*)  She exhibited a "moderately limited" ability to understand, remember and carry out simple job instructions.  (R. 928.)  The assessment cited Adorno's "[h]ypomanic and major [d]epressive [e]pisodes" and noted that "[d]epressive features cause clinically significant distress or impairment in social, occupational and other areas of functioning."  (*Id.*)  Assessing her "ability to adjust personally and socially," boxes were checked on the form to note a "moderately limited" ability to maintain personal appearance, "marked" limitations in the ability to behave in an emotionally stable manner and "extreme"

---

[9]     The signature lines on the form assessment refer to Bazilian as "Stanford Bazilian, MD Treating Psychiatrist" and to Ortiz as "Jezebel Ortiz, MHP Treating Psychotherapist."  (R. 929.) MHP refers generically to "mental health professional."  Because the record is unclear as to whether she possesses a doctoral degree, the Court will refer to Ortiz as Ms. Ortiz rather than Dr. Ortiz.

[10]     This assessment is directly relevant to Adorno's first objection to the R&R.

limitations in the ability to relate predictably in social situations and to demonstrate reliability. (*Id.*) In support of this evaluation, the assessment noted a "[p]ersistent pattern to display mood lability and interpersonal/occupational difficulties." (R. 929.)

In contrast, on November 6, 2013 (just one day after Dr. Bazilian and Ms. Ortiz completed their assessment), Dr. Koleth noted Adorno "reports doing well at this time" and he assessed her as "stable." (R. 1099.) On December 18, 2013, Dr. Koleth again reported that Adorno was "stable," although she complained she felt that one of her medications was no longer working. (R. 935.) He then assessed Adorno as "stable" on January 15, 2014 (R. 1088), February 12, 2014 (R. 1093), March 12, 2014 (R. 1087), April 9, 2014 (R. 1092) and May 14, 2014 (R. 1091).

Ultimately, the ALJ concluded "the medical evidence of record establishes that [Adorno] is limited by the combined effects of her impairments, but not to the degree alleged." (R. 29.) He wrote: "[d]espite her impairments, [Adorno] retains the capacity to perform a range of unskilled[ ] work activity with additional non-exertional limitations as indicated. (R. 29-30.)

### iii

Third, in making his non-disability finding, the ALJ considered vocational expert Nancy Harter's response to his hypothetical. Specifically, he asked Harter to assume a hypothetical individual of Adorno's age, education and past relevant work and asked whether Adorno's past work, which Harter classified as "the classic cashier II," or other work was available. (R. 84.) For purposes of his hypothetical, the ALJ also asked the vocational expert to "assume that the individual is capable of performing work at all exertional levels with the following additional limitations: The reasoning level . . . must

be 1 or 2. There's no more than occasional interaction with coworkers and supervisors. There's no interaction with the general public. There's no more than occasional work at exposed heights." (R. 85.)

Harter concluded Adorno's past work would not be available. Instead she found there were three possible jobs available: "production helper," "at medium," and the "light" jobs of "cleaner" or "laundry worker." (R. 86.) The vocational expert testified all three of these jobs would have supervisors and all three would have the potential for stress. (R. 88.)

## II

The Court reviews *de novo* those portions of the R&R to which Adorno has objected. *See* 28 U.S.C. § 636(b)(1); *see also Brown v. Astrue, 649 F.3d 193 (3d Cir. 2011).* The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c). In reviewing the ALJ's decision, the Court is not permitted to weigh the evidence or substitute its own conclusions for those reached by the ALJ. *See Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Rather, the Court reviews the ALJ's findings to determine whether they were supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

Substantial evidence is evidence a "reasonable mind might accept as adequate to support a conclusion." *Rutherford*, 399 F.3d at 552 (internal quotations omitted). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id.* (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). If the decision of the ALJ is supported by substantial evidence, the Court may not set it

aside "even if [the Court] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)). The ALJ's decision "must therefore present a sufficient explanation of the final determination in order to provide the reviewing court with the benefit of the factual basis underlying the ultimate disability finding." *D'Angelo v. Colvin*, No. 14-6594, 2016 WL 930690, at *1 (E.D. Pa. Mar. 11, 2016) (citing *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)). The decision need only discuss the most relevant evidence concerning a claimant's disability, "but it must provide sufficient discussion to allow the reviewing Court to determine whether its rejection of potentially significant evidence was proper." *Id.* (citing *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir. 2008)).

## III

To determine whether an adult claimant is disabled for the purpose of receiving SSI, an ALJ uses a five-step analysis. 20 C.F.R. § 416.920. First, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 416.920(a)(4)(i). Second, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe," *id.* § 416.920(a)(4)(ii), that "lasted or must be expected to last for a continuous period of at least 12 months." *Id.* § 416.909. Third, the ALJ considers whether the claimant has an impairment that meets or equals the requirements of a listed impairment[11], including the duration requirement. *Id.* § 416.920(a)(4)(iii). Fourth, the ALJ considers whether the claimant retains the residual functional capacity to perform past relevant work. *Id.* § 416.920(a)(4)(iv). Finally, at the fifth step, the ALJ considers whether, given the

---

[11] The Listing of Impairments is found at 20 C.F.R. pt. 404, subpt. P, app. 1.

claimant's residual functional capacity, age, education and work experience, the claimant can make an adjustment to other work. *Id.* § 416.920(a)(4)(v).

Here, the ALJ determined that while Adorno had severe impairments, those impairments did not satisfy step three, specifically finding that her "mental impairments, considered singly and in combination, d[id] not meet or medically equal the criteria of listing 12.04 (Affective disorders) or listing 12.06 (Anxiety related disorders)." (R. 23.) The ALJ also found that Adorno would not meet the requirements of the fourth step, finding that she "ha[d] the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled, reasoning level 1-2 work; no more than occasional interaction with coworkers and supervisors, but no interaction with the general public; and no more than occasional work at exposed heights." (R. 24.) At the fourth step, the ALJ found that Adorno was unable to perform past relevant work. (R. 30.) At the fifth step, he found that, although Adorno's "ability to perform work at all exertional levels ha[d] been compromised by non-exertional limitations, she could make an adjustment to other work. (R. 30.) In reaching his conclusion, he relied on the testimony of the vocational expert that Adorno "would be able to perform the requirements of representative occupations such as production helper . . . , cleaner . . . ; and laundry worker . . . ." (R. 30-31.)

Adorno's objections arise out of the ALJ's finding at step five.

## A

Adorno first objects that the R&R should have, but did not, find that the ALJ's hypothetical question to the vocational expert was insufficient to support the step five

non-disability finding. (ECF No. 17 at 2.) An ALJ's hypothetical question "must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). Adorno contends that the hypothetical question was deficient because it did not account for Dr. Bazilian's opinion that she has "moderate" limitations in understanding, remembering and carrying out simple job instructions. (ECF No. 17 at 3) (citing R. 928). She argues "[i]t is clear that the ultimately adopted hypothetical question did <u>not</u> limit, in any way, the unfettered capacity for continuously understanding, remembering, and carrying out '1 or 2' . . . level job instructions."[12] (ECF No. 17 at 3) (emphasis in original).

The Court finds no error, however, in the ALJ's hypothetical question or in his reliance on the vocational expert's conclusion that jobs existed that Adorno could perform. As the Magistrate Judge explained, the ALJ "did not give controlling or even significant weight to Dr. B[a]zilian's opinion" regarding plaintiff's work-related limitations. . . . Rather, the ALJ only indicated that he had given Dr. B[a]zilian's opinion in this area more than 'minimal' weight."[13] (ECF No. 15 at 21.) Judge Perkin

---

[12] She also places significance on the definition of "moderately limited" on the form completed by Dr. Bazilian and Ms. Ortiz which explains the term as describing an individual with a "significant limitation in sustaining and/or repeating functioning in this area (inability twenty-five percent of the time)." (ECF No. 17 at 3); *see* (R. 926.)

[13] The ALJ clearly stated that he would give "minimal weight" overall to the form assessment completed by Dr. Bazilian and Ms. Ortiz, citing Adorno's other medical records. (R. 29.) He explained that he did "not give [the assessment] controlling weight" because "[t]he limitations are not well supported by objective medical evidence and are inconsistent with the state agency mental assessments." (*Id.*) He wrote that "[t]reatment records do not document sufficient mental status abnormalities to support the severity of the functional impairment indicated. Therapy notes do not reflect that the claimant's ability to work was ever discussed or provide any other basis for the limitations." (*Id.*) In deciding to assign minimal weight to the medical assessment of Adorno's ability to do work-related activities, the ALJ also considered plaintiff's testimony regarding the range of daily activities she "has remained able to perform, including traveling to Puerto Rico and

thus found "the ALJ was entitled to rely upon the VE's responsive testimony as substantial evidence that plaintiff is not disabled" because "the ALJ's hypothetical contained all of the mental work-related limitations that are supported by the evidence of record . . . ." (ECF No. 15 at 21.) The Court agrees that the ALJ appropriately limited the weight of the opinion of Dr. Bazilian and Ms. Ortiz given the inconsistencies between their findings and the other evidence of record.[14]

Contrary to Adorno's objection, the ALJ acknowledged that Dr. Bazilian and Ms. Ortiz had assessed "moderate limitations . . . for working with simple instructions." (R. 29.) His hypothetical question to the vocational examiner sufficiently incorporated these limitations. Specifically, the ALJ asked the vocational expert to, *inter alia*, assume a limitation that the reasoning level "must be 1 or 2." (R. 85.) He also asked the vocational examiner to consider a limitation to "no more than occasional interaction with coworkers and supervisors" and "no interaction with the general public." (*Id.*) In response, the vocational expert identified available other work as including the job of "cleaner, housekeeping" found in the Dictionary of Occupational Titles at number 323.687-014. R. 86. This job has a reasoning level of 1, which requires that a person "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."[15] DICOT 323.687-014 (G.P.O., 4th Ed. 1991), 1991

---

regular trips to the beauty parlor," finding them "wholly inconsistent with the level of limitation indicated" in the assessment by Dr. Bazilian and Ms. Ortiz. (*Id.*)

[14]    The November 5, 2013 assessment by Dr. Bazilian and Ms. Ortiz is little more than a form report. "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993).

[15]    The other jobs identified by the vocational expert as being available to Adorno – "production helper," found in the Dictionary of Occupational Titles at number 529.686-070, and

WL 672783. Thus, the ALJ's hypothetical adequately captured a limitation to working

with simple instructions and the vocational expert's response is sufficient to support

the ALJ's ultimate determination. *Cf. Casillas v. Astrue*, 671 F. Supp. 2d 635, 656 (E.D.

Pa. 2009) ("An ALJ is not required, however, to recite within her hypothetical,

verbatim, each and every medical finding which she finds supported by the record.").

Even if more than minimal weight is given to an assessment that Adorno has

"moderate limitations" for working with simple instructions, there would still be at

least one job in the national economy that she could perform. Further, the ultimate

outcome would be the same even if the ALJ had more explicitly stated this limitation in

his hypothetical to the vocational expert and therefore, remand is not required on this

basis. *See Rutherford*, 399 F.3d at 553 (holding remand was not warranted where error

by an ALJ would not affect the outcome of the case).

## B

Adorno's second objection is that the R&R incorrectly supports its conclusion

that substantial evidence supported the ALJ's step five finding with evidence of her

relative mental stability during her regular psychiatric visits. (ECF No. 17 at 4–6.)

Adorno, citing *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000), contends that an

assessment of her mental stability during a time when she was not working cannot

constitute substantial evidence to support the ALJ's conclusion, *See* (ECF No. 17 at 5.)

---

"laundry worker, domestic" found in the Dictionary of Occupational Titles at number 302.685-010 --
have a reasoning level of 2. (*R. 86.*) Reasoning level 2 requires that a person "[a]pply commonsense
understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems
involving a few concrete variables in or from standardized situations." DICOT 529.686-070 (G.P.O.,
4th Ed. 1991), 1991 WL 674732; DICOT 302.685-010 (G.P.O. 4th Ed. 1991), 1991 WL 672657. Even
if the "moderate limitations" assessed by Dr. Bazilian and Ms. Ortiz would preclude Adorno from
performing jobs with a reasoning level of 2, the ALJ's finding of non-disability would still be
supported by substantial evidence because there is reasoning level 1 work available to plaintiff as a
cleaner.

In *Morales*, however, the claimant's treating physician had opined that he would be unable to work. Given the overall medical evidence, it did not matter that the record contained the treating physician's observation that Morales was "'stable and well controlled with medication' during treatment . . . ." *Id.* at 319. Specifically, the claimant's treating physician found that the claimant had a "seriously impaired or nonexistent" ability to function "in every area related to work." *Id.* Thus, the Third Circuit found that the ALJ could not "supplant[ ]" the opinion of Morales's treating physicians with "an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting." *Id.*

The circumstances here are not the same. Adorno's second objection does not direct the Court to any specific evidence that casts doubt on medical records showing that when she participated in "active psychotherapy," she was "relatively stable." (ECF No. 17 at 4.) As defendant explains, "[t]he Magistrate Judge's discussion of the evidence, like the ALJ's analysis of the evidence in the decision . . . , certainly focused on much more than simply whether Plaintiff was noted to be 'stable' during routine office appointments." (ECF No. 19 at 3.) Unlike in *Morales*, there is no medical evidence clearly supporting a finding that Adorno is unable to work. Rather, Adorno's medical records support the ALJ's finding that she is able to work, albeit with limitations.

The ALJ cited medical records showing that Adorno was "doing well" in November and December of 2013 and evidencing her stability in January 2014 through May 2014. (R. 26–27.) But he also acknowledged that "[t]he record confirms that [Adorno] is depressed." (R. 27.) The ALJ noted that Adorno's "mental health treatment

records document her ongoing symptoms of bipolar disorder, depression and anxiety despite medication and therapy . . . ." (*Id.*) He weighed evidence of her repeated inpatient hospitalizations, including in March, April and June 2012. He explicitly considered the records from each hospital stay, and found that "[e]ven when [Adorno] was hospitalized for depression and suicide attempts, her mental status typically remained intact." (*Id.*) The Court finds no reason in the record to question the ALJ's finding that Adorno did not require inpatient treatment after June 2012 and had "become more stable and not required further hospital treatment." (*Id.*) Substantial evidence supports his conclusion that Adorno, "[t]o her credit," was compliant with recommendations after her hospitalization in June 2012 for "consistent outpatient treatment with regular medication checks with psychiatrists and supportive therapy." (*Id.*) There is substantial evidence in the record to support the ALJ's non-disability finding. (*Id.* at 4.)

## C

For the above reasons, the Court will overrule Adorno's objections, approve and adopt the Magistrate Judge's Report and Recommendation finding that the ALJ's finding of non-disability should be affirmed and grant judgment in favor of the Commissioner.

An appropriate order follows.

BY THE COURT:


***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.